(REV.5/85) Criminal Complaint

TERRA BROWN, AUSA (312) 353-3148
TINOS DIAMANTATOS, FAUSA (312) 353-4317

FILED
JUL 22 2008
MICHAEL T. MASON
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JOSE AYALA,
also known as "Don Jose"

CRIMINAL COMPLAINT

CASE NUMBER 08 CR 582

MAGISTRATE JUDGE MASON

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief:

On or about __July 21, 2008,__ in __Cook__ County, and elsewhere, in the __Northern__ District of __Illinois,__ defendant, knowingly and intentionally distributed a controlled substance, namely, 500 grams or more of mixtures and substances containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title __21__ United States Code, Section __841(a)(1)__.

I further state that I am a(n) __Special Agent, FBI,__ and that this complaint is based
                                   Official Title
on the following facts:

See Attached Affidavit.

Continued on the attached sheet and made a part hereof:  __X__ Yes  ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

July 22, 2008                                    at      Chicago, Illinois
Date                                                     City and State

Magistrate Judge Michael T. Mason               _____
Name & Title of Judicial Officer                 Signature of Judicial Officer

STATE OF ILLINOIS )
                  )
COUNTY OF COOK    )

## AFFIDAVIT

I, David R. Hall, Special Agent, Federal Bureau of Investigation (hereinafter, "FBI"), being duly sworn, states as follows:

1.  I am a Special Agent with the Federal Bureau of Investigation and have been so employed for approximately six years. I have received specialized training in narcotics and dangerous drug investigations while employed as a Special Agent. I am familiar with and have participated in all of the normal methods of investigations, including but not limited to visual surveillance, general questioning of witnesses, and use of search warrants, informant and cooperating witness debriefings, and document analysis. I have been personally involved in investigations of controlled substances-related offenses involving the possession, sale, and distribution of cocaine and crack cocaine in the Chicago metropolitan area, and investigations involving distribution of these substances by drug trafficking organizations and street gangs.

2.  I am currently assigned to the South Resident Agency, which investigates, among other crimes, drug trafficking crimes in and around the south suburbs of the Chicago metropolitan area. In my role as a FBI Special Agent, I have participated in numerous investigations that have utilized court authorized wire interceptions. I have debriefed and interviewed numerous individuals who have been involved in street gangs and drug trafficking. The information in this Affidavit is drawn from my interviews of cooperating sources; information obtained from consensual recordings; physical surveillance; information received from other law enforcement agents; my experience and training; and the experience of other agents. As part of my current assignment, I have investigated

criminal violations of the Controlled Substance Act as found in Title 21 of the United States Code, as well as related violations found in Title 18 of the United States Code. Based on my training and experience, I am familiar with the ways in which individuals conduct their drug-related business, including, but not limited to their: (a) methods of distributing narcotics; (b) use of telephone communication devices; and (c) use of code words to identify themselves and the nature of the communication, and to conduct their drug-related transactions.

### *Purpose of Affidavit*

3. This affidavit is being submitted for the limited purpose of establishing probable cause for the arrest of JOSE AYALA, also known as "Don Jose." The criminal complaint charges that JOSE AYALA, a/k/a "Don Jose," knowingly distributed a controlled substance, namely 500 grams or more of mixtures and substances containing cocaine, in violation of Title 21, United States Code, Section 841(a)(1). Because the information set forth below is for the limited purpose of establishing probable cause, this Affidavit does not contain all the information known to law enforcement regarding this investigation.

4. In this Affidavit, I have summarized some intercepted conversations made during the course of the investigation. Some of the conversations are in the Spanish language and have been preliminarily translated. To the extent that Affiant uses quoted language in this Affidavit from those intercepted conversations, the quotes are taken from careful review of the conversations but are still in draft format and are not intended to be final translations, transcripts, or quotations.

### *Summary of Investigation*

5. Since approximately November 2006, the FBI and the Joliet Police Department (hereinafter "JPD") have been conducting a joint investigation of the BARRY WARE drug

-2-

trafficking organization (hereinafter "the WARE Organization") in the Joliet, Illinois area. During the course of the investigation, agents have obtained historical information from confidential witnesses, intercepted wire communications between WARE and members of the WARE Organization pursuant to court orders, conducted surveillance of BARRY WARE and members of the WARE Organization, conducted controlled buys of narcotics from BARRY WARE and members of the WARE Organization, and seized narcotics from members of the WARE Organization. Based on the investigation to date, the WARE Organization is responsible for the distribution of wholesale quantities of cocaine and crack cocaine in the Joliet area.

6. During the week of February 12, 2008, law enforcement from the JPD and the FBI arrested Barry Ware and ten other individuals, *United States v. Barry Ware, et al.*, 08 CR 122 (Magistrate Judge Maria Valdez), charging them with conspiracy to possess with intent to distribute and distribution of controlled substances, namely in excess of 50 grams of mixtures and substances containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance, and in excess of 5 kilograms of mixtures and substances containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

7. On March 12, 2008, FBI agents approached an individual (hereinafter "CS-7") who law enforcement had previously identified as a supplier of wholesale quantities of cocaine to the WARE Organization. CS-7 agreed to cooperate with the FBI in exchange for consideration with respect to any charge he/she may face as a result of his/her distribution of cocaine to the WARE Organization. CS-7 has provided timely, reliable information to the FBI since March 12, 2008. CS-7 has not been paid for his/her cooperation. CS-7 has not yet been charged for his/her distribution of

cocaine to the WARE Organization.

8.  According to CS-7, between March 2006 and late 2007, CS-7 provided one to two kilograms of cocaine to Barry Ware approximately five times. CS-7 identified the person from whom he/she obtained the cocaine as "Don Jose". As set forth below, law enforcement subsequently identified "Don Jose" as JOSE AYALA (hereinafter "AYALA"). CS-7 stated that he/she paid AYALA between $20,000 and $22,000 up front for each kilogram of cocaine. CS-7 explained that he/she contacted ALAYA by telephone each time he/she needed to obtain cocaine for Barry Ware. According to CS-7, on each occasion, "Don Jose" directed CS-7 to stop by the Los Compadres bar, located at 3031 S. Archer Avenue in Chicago, Illinois when CS-7 got off work.

9.  Lexis/Nexus records identify JOSE ALAYA as the business contact for and manager of the Los Compadres bar.[1] CS-7 identified the Illinois Driver's License photograph of JOSE AYALA as the person he/she knows as "Don Jose".

10. According to CS-7, on each occasion he/she purchased cocaine from AYALA, he/she first met AYALA in the storeroom in the rear of the bar, where they discussed the quantity and price of cocaine CS-7 wanted to purchase from AYALA. CS-7 then contacted Barry Ware to confirm the quantity and price of cocaine. CS-7 next traveled to the Joliet, Illinois area, where he/she met with Barry Ware to collect the money for the cocaine. CS-7 subsequently contacted AYALA, and advised AYALA that he/she had the money for the cocaine transaction. AYALA directed CS-7 to meet AYALA at AYALA's residence at 3617 S. Winchester Street, Chicago, Illinois at an agreed upon time.

11. Illinois Secretary of State records identify AYALA's address as 3617 S. Winchester

---

[1] Lexis/Nexus records identifies the Los Compadres bar as "Los Com Padres".

Street, Apartment 1, Chicago, Illinois.

12. According to CS-7, CS-7 met with AYALA in the living room of AYALA's residence on each occasion after being directed to do so by AYALA. While at AYALA's residence, CS-7 observed an unknown male deliver cocaine to AYALA's residence. While at the residence, CS-7 paid AYALA for the cocaine, and AYALA provided CS-7 with the cocaine.

13. According to CS-7, he/she lost AYALA's phone number in February 2008. On Friday, June 13, 2008, at the direction of the FBI, CS-7 went to the Los Compadres bar and briefly met with AYALA. Prior to the meeting, FBI agents met with CS-7 at a prearranged location, and searched CS-7 for money, drugs or other contraband, with negative results. FBI agents then outfitted CS-7 with a body recording device. Surveillance observed CS-7 enter the Los Compadres bar at approximately 5:48 p.m. Surveillance observed CS-7 exit the Los Compadres bar at approximately 6:00 p.m. Following the meeting between CS-7 and AYALA, FBI agents met with CS-7 at a prearranged location, and searched CS-7 for money, drugs or other contraband, with negative results. FBI agents then recovered the body recording device from CS-7. The body recording device functioned properly, but the recording of the conversation between CS-7 and AYALA is unintelligible, however, due to loud music in the Los Compadres bar. FBI agents then debriefed CS-7. According to CS-7, CS-7 told AYALA that he/she was interested in buying at least one kilogram of cocaine. AYALA told CS-7 that he would call CS-7 when he had a supply of cocaine for CS-7. CS-7 then provided AYALA with his/her cell phone number.

14. On June 16, 2008, at approximately 12:44 p.m., CS-7 received a phone call from AYALA on CS-7's cellular telephone. The telephone call was not recorded. According to the caller

identification feature on CS-7's cellular telephone, AYALA called from number (773) 715-2579.[2] That same afternoon, CS-7 relayed the substance of his/her conversation with AYALA to a FBI agent. According to CS-7, AYALA directed CS-7 to "stop by" after CS-7 got off of work. CS-7 understood AYALA to be telling him/her that he had a supply of cocaine to sell to CS-7. CS-7 told AYALA that he/she would contact him at a later time.

15. At approximately 9:55 p.m., CS-7 made a recorded telephone call to AYALA at number (773) 715-2579. During the call, CS-7 told AYALA that he got busy and would meet with AYALA the following day to discuss the cocaine transaction.

16. On June 17, 2008, at approximately 5:35 p.m., 5:41 p.m., and 5:56 p.m., CS-7 made recorded telephone calls in the presence of a FBI agent to AYALA at number (773) 715-2579. The telephone calls went to voice mail. CS-7 did not leave voice mail messages. At approximately 5:57 p.m., CS-7 received a recorded telephone call in the presence of a FBI agent from AYALA on CS-7's cellular telephone. According to the caller identification feature on CS-7's cellular telephone, AYALA called from number (773) 715-2579. During the telephone call, CS-7 asked AYALA if he was available to talk. AYALA instructed CS-7 to "come down" to meet with him. CS-7 understood AYALA to be telling him/her to meet him at the Los Compadres bar.

17. In the early evening of June 17, 2008, CS-7 met with AYALA at the Los Compadres bar. Prior to the meeting, FBI agents met with CS-7 at a prearranged location, and searched CS-7 for money, drugs or other contraband, with negative results. FBI agents then outfitted CS-7 with a body recording device and transmitting device. Surveillance observed CS-7 enter the Los

---

[2] Law enforcement has not received the subscriber information or telephone toll records for CS-7's cellular telephone or the telephone number used by AYALA.

Compadres bar at approximately 7:06 p.m. Surveillance observed CS-7 exit the Los Compadres bar at approximately 7:14 p.m. Following the meeting between CS-7 and AYALA, FBI agents met with CS-7 at a prearranged location, and searched CS-7 for money, drugs or other contraband, with negative results. FBI agents then recovered the body recording device and transmitting device from CS-7.

18.   FBI agents next debriefed CS-7. According to CS-7, CS-7 and AYALA discussed the price for one kilogram of cocaine. AYALA indicated that his supplier was charging $24,000 per kilogram, and that as a result, AYALA would charge CS-7 $24,500. CS-7 conferred, via text message and phone call, with a FBI agent who was posing as CS-7's cocaine customer regarding the price of one kilogram of cocaine. CS-7 then confirmed with AYALA that CS-7's customer was willing to pay $24,500 for one kilogram of cocaine. AYALA explained to CS-7 that his supplier would not be able to provide the kilogram of cocaine until the following day, June 18, 2008. AYALA instructed CS-7 to contact him after CS-7 left work on June 18, 2008. CS-7 agreed to do so. CS-7 understood AYALA to be asking him/her to contact him for the purpose of completing the cocaine transaction.

19.   On June 18, 2008, at approximately 5:00 p.m., CS-7 made a recorded telephone conversation with AYALA. CS-7 talked with AYALA to inquire if AYALA had the kilogram of cocaine CS-7 wanted. AYALA stated that he had talked with someone and it would be here tomorrow. CS-7 asked AYALA if he really thought it would be in tomorrow, AYALA stated he thought it would. CS-7 told AYALA he would talk with him tomorrow.

20.   On June 19, 2008, at approximately 5:19 p.m., CS-7 made a recorded telephone conversation with AYALA. CS-7 was inquired to what was going on with there deal. AYALA

stated "they" (meaning AYALA's source of supply) haven't called me back. AYALA stated he would call "them" (AYALA's source of supply) right now and get an answer for CS-7. CS-7 did not get an answer.

21. On June 21, 2008, at approximately 6:44 p.m., CS-7 made a recorded conversation when CS-7 met with AYALA at the Los Compadres Bar, 3031 S. Archer Avenue, Chicago, Illinois. AYALA took CS-7 into the back storage area to talk with CS-7 concerning the purchase of one kilogram of powder cocaine at $24,500. AYALA told CS-7 that his original supplier was completely out of kilograms of cocaine. AYALA then told CS-7 that he had a different supplier that would sell CS-7 a kilogram of cocaine for a better price at $24,000. AYALA advised CS-7 that because of the late hour, AYALA had temporarily lost communication with this source of supply. AYALA advised CS-7 that CS-7 may have to wait until the next day to obtain the kilogram of cocaine. CS-7 began to complain to AYALA about the constant confusion in obtaining the kilogram CS-7 had ordered. AYALA blamed the "back and forth" between he and CS-7 in obtaining the kilogram of cocaine on AYALA's suppliers failure to deliver. AYALA assured CS-7 that tomorrow would be better.

22. On July 5, 2008, at various times throughout the day AYALA called CS-7's cell phone. CS-7 did not answer his/her phone but knew it was AYALA from checking his/her caller identification. CS-7 stated that AYALA attempted to get a hold of him approximately eight times.

23. On July 10, 2008, at approximately 8:54 p.m. and 8:59 p.m., AYALA called CS-7's cell phone. CS-7 did not answer his/her phone. CS-7 knew it was AYALA because CS-7 checked his/her caller identification.

24. On July 11, 2008, at approximately 6:56 p.m., AYALA contacted CS-7 via cell

phone CS-7 immediately apologized for missing AYALA's previous calls. CS-7 told AYALA he/she had left his/her cell phone in the car. CS-7 stated to AYALA that he/she must of had something good to have called me so many times. AYALA stated everything was "great" the price and product (meaning the cocaine was of good quality). AYALA asked CS-7 if CS-7 could come by the bar later to talk. CS-7 told AYALA he/she would let him know. AYALA stated "ok". CS-7 did not call AYALA back.

25. On July 17, 2008, at approximately 1:05 p.m., AYALA asked CS-7 how he/she was doing. CS-7 stated he/she was busy at work and would call AYALA back. AYALA stated he had something to tell CS-7 and would talk to CS-7 later (CS-7 knows this to mean that AYALA has an amount of cocaine available for CS-7).

26. On July 17, 2008, at approximately 7:06 p.m., CS-7 called AYALA at cell number (773) 715-2579 but reached AYALA's voice mail. CS-7 did not leave a message. AYALA called CS-7 back at approximately 7:08 p.m. and talked with CS-7 concerning selling CS-7 a kilogram of powder cocaine. This call was recorded. AYALA asked CS-7 if he/she could come by the Los Compadres Bar and talk about and confirm the price of the kilogram. CS-7 stated he/she would meet with AYALA on Monday afternoon, July 21, 2008. AYALA agreed.

27. On July 21, 2008, at approximately 5:30 p.m., AYALA called CS-7. The caller identification feature on CS-7's telephone indicated that AYALA was calling CS-7 from telephone number (773) 715-2579. The call was recorded. During the conversation, CS-7 complained to AYALA using words to the effect of "25 dollars was expensive for a bottle" (referring to $25,500 per kilogram of cocaine) for and asked AYALA if AYALA could come down in price. In response, AYALA said that he could go down "two" (two hundred dollars). CS-7 agreed on the reduced price

and asked if a half hour would be okay for AYALA or if AYALA needed more time. AYALA responded that he would make a call to check and then would call CS-7 back. According to CS-7 AYALA further explained that AYALA's source was the same person that they have dealt with before who works a night shift.

28. At approximately 5:31 p.m., AYALA called CS-7. The caller identification feature on CS-7's telephone indicated that AYALA was calling CS-7 from telephone number (773) 715-2579. The call was recorded. During the conversation, AYALA said that AYALA's source had not gone into work yet and that AYALA's source was available to make the delivery that evening. AYALA asked CS-7 whether CS-7 wanted only "one" to which CS-7 responded that CS-7 wanted to test the quality before CS-7 purchased more. CS-7 asked AYALA if AYALA wanted CS-7 to take delivery of the product at the AYALA residence. AYALA responded yes and said that CS-7 and AYALA should meet at the AYALA residence in about 45 minutes.

29. At approximately 8:50 p.m. law enforcement was with CS-7 at a predetermined location. Law enforcement searched CS-7 and CS-7's vehicle for the presence of money, narcotics, and contraband with negative results. Law enforcement provided CS-7 with a blue back pack containing $25,300 in pre-recorded funds. Law enforcement equipped CS-7 with an audio recording and transmitter device.

30. At approximately 9:00 p.m. law enforcement observed CS-7 proceed to the AYALA residence and park CS-7's vehicle outside of the AYALA residence. CS-7 exited his vehicle, carrying the blue back pack, and approached the AYALA residence. Moments later, agents observed CS-7 enter the AYALA residence.

31. At approximately 9:09 p.m., law enforcement observed CS-7 exit the AYALA

residence carrying the blue back pack. Law enforcement observed CS-7 enter CS-7's vehicle and drive away.

32. At approximately 9:10 p.m., CS-7 contacted law enforcement via cell phone and provided law enforcement with a prearranged signal notifying law enforcement that CS-7 had completed the cocaine transaction with AYALA. Law enforcement subsequently met with CS-7 at a prearranged meet location where law enforcement recovered the blue back pack, and audio recording device and transmitter from CS-7. Law enforcement searched CS-7 for drugs, money, and other contraband, with negative results. Shortly thereafter, law enforcement removed a brick-shaped item wrapped in plastic contained in a plastic bag from the blue back pack.

33. Shortly thereafter, law enforcement entered AYALYA's residence pursuant to a search warrant issued on July 21, 2008 by United States Magistrate Judge Michael T. Mason. Upon entering the residence, law enforcement informed AYALA that they had a search warrant for his residence. Law enforcement placed AYALA under arrest, and provided AYALA with his Miranda rights in Spanish. AYALA waived those rights. AYALA provided verbal consent in Spanish to law enforcement to search his residence. Law enforcement subsequently searched AYALA's residence. During the search, law enforcement recovered, among other items, approximately $26,625 from AYALA's person and a bedroom of AYALA's apartment.

34. Law enforcement subsequently interviewed AYALA. During the interview, AYALA admitted, among other things, that he had distributed one kilogram of cocaine to CS-7 shortly before his arrest on July 21, 2008. AYALA explained that CS-7 had paid him $25,300 for the kilogram of cocaine, $1,000 of which was to be AYALA's profit. AYALA further admitted to having sold kilogram quantities of cocaine to CS-7 on prior occasions.

*Conclusion*

35. Based on the information set forth in this affidavit, there is probable cause to believe that JOSE AYALA, a/k/a "Don Jose", knowingly and intentionally distributed a controlled substance, namely, 500 grams or more of mixtures and substances containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT

DAVID R. HALL, JR.
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO BEFORE ME
this 22st day of July, 2008

HONORABLE MICHAEL T. MASON
United States Magistrate Judge